Martling v. Martling.

ELIZABETH MARTLING

*v.*

DAVID MARTLING et ux.

1. In order to pass the title to land by conveyance, there must be such an actual or constructive *tradition* of the deed from grantor to grantee as puts it beyond the control of the former, and it must be accompanied by an *intention* to pass the title at once.

2. A son procured from his mother, who was advanced in years and had implicit confidence in him, a deed of conveyance of land which was intended to be in the nature of a testamentary disposition and to take effect at her death, but which did not contain any power of revocation or reservation of a life estate, and which was executed without any independent advice as to its effect.—*Held*, that the deed, even if considered as so far delivered as to pass the title, must be set aside.

3. The son put the deed on record without his mother's consent, and then procured her to execute a deed of ratification of the recording upon receiving a conveyance from him for life, she being ignorant of her rights, and still without independent advice.— *Held*, that the deed of ratification must be set aside.

On final hearing on bill, answer and proofs.

*Mr. C. Christie* and *Mr. W. B. Williams,* for the complainant.

*Mr. W. M. Johnson,* for the defendants.

PITNEY, V. C.

Complainant seeks by this suit to be relieved from the effect of two certain deeds of conveyance, each bearing date September 30th, 1884, and recorded in Bergen county clerk's office July 30th, 1888, executed by her to the defendant, who is her son, and purporting to convey certain lands in Bergen county. The consideration expressed in one of them is love and affection and $1, and in the other $1 simply. The premises conveyed are situate in Ridgefield township, Bergen county. Those comprised in one of the deeds lie on the east side of the Bergen turnpike, and those in the other on the west side and immediately opposite to the first.

The bill alleges that these deeds were executed by complainant, who at the time was a widow seventy-four years old, at the earnest solicitation and entreaty and by the influence and persuasion of the defendant, and as a part of a scheme for the disposition of all her landed property, which was intended by her to be testamentary in its nature. That at the same time she executed two other deeds of conveyance to her other two children of other lands, but retained possession of all of them, in pursuance of a distinct understanding with the defendant that she was to retain such possession during her life, with the right, on her part, to destroy either of them, if she chose to do so. That she afterwards placed all of said deeds, with other valuable papers, in a box, of which she retained the key, and deposited the same, by the hands of the defendant, in the Hudson County National Bank, Jersey City, for safe keeping; that on July 30th, 1888, defendant procured the possession of the said box, took it from the bank, broke it open, abstracted the two deeds so executed to him, and placed the same on record in the Bergen county clerk's office, all without her knowledge or consent; that on August 1st, 1888, defendant executed a deed to her conveying said premises to her for life, and induced her to believe that she was thereby restored to her full rights, but that she did not understand the nature of the transaction.

The answer denies that the deeds in question were executed at the special solicitation &c. of the defendant, but alleges that they

Martling *v.* Martling.

were entirely complainant's own idea, and were planned and executed of her own free will, and were in strict accordance with a previously-executed will and her well-settled wishes. It denies that the deeds were not fully delivered, but alleges that the two made to the defendant were formally delivered to him at the moment of their execution, but that it was understood that the fact of their execution was to be concealed and that they were not to be recorded, and that complainant was to have the use of the premises for life, but that defendant was to take immediate possession, which he did, and was to pay complainant the income for her life ; that the deeds were left in complainant's possession temporarily, but that she subsequently delivered them to defendant, and that they were placed in the box and deposited in the bank subject to defendant's order ; that he took possession of the premises and expended considerable sums of money, with complainant's knowledge and approval, upon them, and thereby increased their value.

The answer further alleges, that in July, 1888, after these improvements were made, complainant became dissatisfied and asked the return of the deeds, which defendant refused, and fearing that complainant would encumber or dispose of the property, he procured the deeds and placed them on record, as he had a right to do, and informed complainant of the fact, and that he then and there agreed with her to convey to her a life estate in the premises, which she accepted intelligently and cheerfully, and was entirely satisfied therewith, and at the same time executed to him a paper writing, under seal, which was a ratification of the two deeds in question and of his registry thereof.

At the hearing, upon these pleadings, the following questions were litigated : *First.* Were the deeds in question, at their execution, delivered in such a manner that the estate vested in the grantee, and the grantor had no further control over it ? *Second.* If they were so delivered, were the circumstances such as to entitle the complainant to have them set aside and the title re-vested in her ? *Third.* If they were not so delivered, was the execution of the subsequent deed of ratification and acceptance of a life estate by complainant binding upon her ?

The evidence showed that complainant was the owner of a farm;. comprising the lands in question and other land, situate on both. sides of the Bergen turnpike, in Ridgefield township, Bergen. county. The part lying on the east side was an irregular parallel-ogram, with a frontage on the road of about eight hundred feet; and a depth of about forty-two hundred feet, and contained about seventy-two acres. In about the middle of its front was the· dwelling, and in the rear of the dwelling the usual out-buildings.. On the west side of the turnpike were about eight acres of land;. and upon that tract was a dwelling suitable to be let out to· tenants. Complainant had three children—Stephen H. Martling, Annabella Acker and the defendant. Her husband died in 1880. In his lifetime she had conveyed to Stephen a small lot, carved. out of the north corner of the farm, on the east side of the road,. and to her daughter Annabella a small lot, carved out of the· southerly corner, on the same side of the road, and they had each. erected thereon comfortable dwellings, and were living in them apparently as people of leisure and considerable wealth. She· had also, at about the same time, conveyed to defendant a lot on: the west side of the turnpike, which at the time was supposed to· be equal in value with the lands given to the others, but which in reality was somewhat less in value. Defendant had built on this lot and had sold it. In her husband's lifetime she had exe-cuted jointly with him a will by which she gave all the land on the west side to David, the defendant, for life, and at his death. to his son Abraham, and had divided the land on the east side into three equal parts, lengthwise, making three very narrow strips with the ends upon the road, and having the dwelling· and other buildings on the middle strip; and she gave, by her will, to David, the defendant, the middle piece, to Stephen the· northerly and to Annabella the southerly one. This will was. prepared and its execution supervised by Mr. Samuel E. De· Groot, a resident of the neighborhood and a master of this court,. who was sworn as a witness, and appeared to be an intelligent and competent person. I am satisfied from his evidence· that it. was properly worded to carry out the intention of the· testator,. and was well executed to pass real estate. This· will was·

destroyed. The fact that it made an actual division of the land on the east side of the road in the manner above stated, and that by it defendant got the middle strip with the buildings, is clearly proven by the evidence of the defendant himself, who read it twice shortly before it was destroyed. Complainant and her husband had lived for many years with their daughter, Mrs. Acker. The homestead dwelling, which had become dilapidated, had been rented out, as was also the dwelling on the west side of the road and the farm. Complainant does not seem to have had any other property of any consequence or other source of income except the rents of the real estate in question. The defendant was her favorite son, and she confided in him fully. After her husband's death she entrusted him with the transaction of all her business. To this he himself testifies. To him only of her children she showed her will. She entertained for him the greatest affection, and up to and during the hearing she met and treated him with great cordiality and affection on all occasions and as to all matters except as to the disposition of her property now in question, upon which subject, whenever introduced, she became at once excited and angry. She is evidently a person of a very emotional nature, easily carried away by her feelings and subject to fits of passion with varying phases, and passing easily from the one extreme of anger and indignation to the other of love and confidence. These characteristics render it prudent and necessary to scan her evidence with care. Besides, she is clearly mistaken in several matters, and I have therefore placed but limited reliance upon her testimony.

The defendant was for many years freight agent of the Northern railroad at the Erie docks, Jersey City. During the time covered by these transactions he lived first in Brooklyn, afterwards in Jersey City, and then on the premises in question. Before moving to the premises he visited his mother frequently. She and Mr. Acker both swear that he timed his visits to avoid meeting Mr. and Mrs. Acker. This the defendant denies, but I think the fact is with the complainant. Defendant induced Mr. and Mrs. Acker to take a house and spend the winter of '81–'82 in Jersey City, leaving complainant in their house with the servants and

Martling *v.* Martling.

horses and carriage, and it was during that winter that the trans-actions in question had their origin.   Complainant swears that, from the time of her husband's death, defendant beset her about her property and her will; told her that he was not satisfied with the will, that he would be cheated out of his share given him by it, and wished it destroyed; that he importuned her so much and so continuously about it that she finally consented that he should destroy it, and he did so in her presence.   Defendant denies that he destroyed it, but says that she did it of her own free will. After that, she says, he wished her to make deeds for the prop-·erty; beset her at every interview—to use her own expression—" with all the persuasion that could be off of mortal lips."   That he wanted deeds made to cover the property precisely as the will had given it, and for that purpose employed a surveyor to come and run out the division and prepare deeds, which was done, and the deeds handed to her, and that she refused to execute them. There the matter rested for a year or two, when, as she says, her ·son again stirred the matter, and took her to Mr. Furey's office to ·execute the deeds in controversy.   The defendant denies much of this statement.   He produced Mr. Furey as a witness, who swears that, in December, 1881, he was introduced to complainant by de-fendant, whose stated counsel he was, and called at her house; that she there advised with him about her will; showed him a paper which was signed by herself and husband, and which I am satisfied was the will prepared by De Groot and afterwards destroyed; that he advised her that it was no will, and would have no effect in disposing of her property.   She expressed fears to him that there would be trouble and litigation over her prop-·erty after her death if she disposed of it by will, and that David would be cheated out of his share, which she told Furey was to be the middle strip of the land on the east side of the turnpike; that he (Furey) suggested deeds instead of a will, and that she should send for a surveyor and have the division lines marked out and a map made to be filed in the clerk's office in her life-time to accompany either a will or a deed.   He further swears that defendant objected to the plan of giving the land on the west side to him (David) for his life and at his death to his son

Abraham, and wished it given to him outright; that complainant did not consent to that, and that shortly after he met defendant in the street, who told him that his mother was obstinate about the matter of the land on the west side of the road, and, later on, he further told him that she had yielded and had concluded to do as he wished about it, and that now she was ready to make the deeds. Defendant says of Furey's interview in December, 1881:

> "Mr. Furey came and explained to her how, in case of dispute between my brother and sister, they might claim that the centre part would not be allotted to me. It might cause a lawsuit and would be very expensive."

And further on, "the advice was given and she accepted it—to have the deeds made in the way expressed in that will as she stated."

Further, with regard to the lot west of the road, defendant states that he argued with his mother about it and urged her not to give it to him for life and after his death to Abraham, but to give it to him out and out, and that after much arguing "she consented to have it drawn to my name, and made me promise to say that I would take care of him if he became a man—if he would reform." One ground urged for cutting off Abraham was, that he was undutiful to defendant and irregular in his habits.

It further appears by the evidence that, in the spring of 1882, complainant employed a surveyor, who, by her direction, made a partition by metes and bounds of the easterly lot, dividing it into three equal parts in accordance with her direction and with the plan contained in the will, and prepared three deeds of conveyance from complainant to each of her children for the three parts so designated, one to each, and left the deeds with a map with her; that she declined to execute the deeds, but retained their possession. No instructions were given by her to the surveyor, and no conveyance was prepared by him touching the westerly lot.

In that position the matter appears to have rested until the fall of 1884, when Furey received from the defendant these:

three unexecuted deeds, and, by his instruction, prepared from them three new deeds and a fourth for the westerly lot, the latter being described without courses or distances by a mere reference to adjoining owners. Then, according to Furey's evidence, about two weeks later, complainant and defendant appeared together at his office and the deeds were executed. Complainant swears that she never saw them until she executed them. Defendant swears that she had them in her possession for a long time previously. I am satisfied, from Furey's evidence, that complainant is correct as to this matter, and that the only deeds complainant had before execution were the unexecuted ones prepared by the surveyor.

Furey's account of the execution is, that he frankly stated to complainant that he was acting as counsel for, and entirely in the interest of, the defendant, and was therefore unfit to advise her, and for that reason he called in a Mr. Kelly, a young attorney of Jersey City, who advised and counseled with her. Kelly did come in and saw complainant, but he had neither previous acquaintance with the complainant nor present knowledge of her affairs. He had no consultation with her, but went through the ceremony of stating the contents of the two deeds to her and signing them as a witness. Called as a witness at the hearing, he had no recollection at all of the circumstances. It seems hardly necessary to say that there was in all that no approach even to independent counsel and advice.

All four of the deeds were acknowledged by complainant to Mr. Furey and certified by him, and the two in question were handed to the defendant and by him handed to the complainant. Defendant then paid complainant $2 for the consideration named in the deeds, and she handed that to Furey for his services. This was all done as one transaction. Complainant retained the custody of the deeds for at least two years, when, according to the defendant's evidence, she became restive under their custody and anxious for some other disposition of them. He swears that she went with defendant to the clerk's office at Hackensack, and requested that official to take care of them, but he declined. Then it was suggested that they be deposited in some bank vault. De-

fendant purchased a tin box with a lock and single key.  Complainant paid for it.  All four of the deeds of September, 1884, were deposited by her in it, with the title deeds and other valuable papers belonging to her.  No papers of defendant were placed in it.  The box was locked, the key retained by the complainant, and the box, by complainant's direction, deposited in the Hudson County Bank by the defendant and subject to his order.  He, as he swears, sent his mother a written authority for her to get the box.  Thus, by possession of the key and written authority to get the box, she had complete control of it, as she supposed, but this written authority she seems to have lost.

Defendant then took possession of the premises under lease from his mother, and, in 1887, spent several thousand dollars in improving the buildings on the easterly lot, with his mother's knowledge and consent.  She lived with him and his wife on the premises, receiving her board as rent of the house.

In July, 1888, the complainant became restive about the deeds and asked defendant to bring them home.  He put her off with various excuses, and she persisted in demanding their return.  He finally declined to return them, and she became very angry.  On the 30th of July she went with her son-in-law and her counsel, Mr. Christie, to the bank and demanded the box.  The bank officers declined to deliver it, sent word of the demand to the defendant, who went to the bank, got the box, took it away, broke it open, took out the two deeds to him and placed them on record.

Bearing on the question whether this formal delivery was intended to be absolute or only in the nature of a testamentary disposition, are some other pieces of evidence worthy of notice.  Mr. Furey swears that at the interview of December, 1881, it was decided that the complainant would have a survey for a partition made by a surveyor, and would send for him to draw a will, or, if she concluded to have deeds drawn, she would not execute them presently, but wait until she was about to die, and then send for a master in chancery and acknowledge and deliver them and have done with them.  He swears that she asked him—

Martling v. Martling.

" ' Supposing the place was sold [by " sold," the witness explained, was meant ·divide among her children by conveyances] by her to the children, could she retain the deeds in her possession until she was dying, or could they be retained until after her death ?' I said: ' By consent—if they could agree upon the sale of this place as it was indicated by the shares, and after the delivery of the deeds ·they could, by family consent, give her back the deeds, and she ·could put them in a safe place and they were not to have them until she died.' "

And defendant swears—

" I gave her an order on the bank to get this box in case of my death, to gratify her; my mother had a feeling *she would dispose of this in another way in ·case I died.*

"*Q.* Why did you not give her an absolute order ?

"*A.* I did.

"*Q.* Why in case of your death ?

"*A.* In case she died first, I was to get it and then hand it to the children."

By "it" I understand he meant the box, and handing it to the ·children after her death was evidently in the nature of opening and reading a will. From all these circumstances, I think it is ·evident that there never was any final delivery. The formal ·acknowledgment and tradition by mother to son, and from son to mother, were colorable merely, and were not intended or under-·stood by the parties to operate to vest the title presently in the parties. Certain it is that the complainant did not understand ·that she then parted with the ownership and control of her prop-·erty, and it is equally certain that the defendant knew perfectly well that she did not so understand.

I think the second question must also be resolved in complain-ant's favor. The evidence satisfies me that defendant took advan-tage, first, of the great affection his mother entertained for him and the confidence she had in him, with the aid of his counsel, ·to persuade her to destroy her will by means of representations and advice that were, to say the least, neither true nor accurate, and then, by persistent entreaty and persuasion, induced her to ·change the scheme of the division of her property by giving him a fee simple instead of a life estate in the piece west of the turn-pike, and to give him absolute deeds for his share, upon the idea that such mode of carrying out her wishes was necessary in order

Martling *v.* Martling.

to secure him from litigation, and leave her the control of her property during her lifetime. The deeds are therefore infected with the double vice of (1) being obtained by misrepresentation and undue influence, and (2) of failing to secure to the grantor a life interest and power of revocation. These vices are fatal. No extended citation of authority is necessary. The cases are collected and reviewed in *Garnsey* v. *Mundy, 9 C. E. Gr. 243 ; Mulock* v. *Mulock, 4 Stew. Eq. 594 ;* and in *Russell's Appeal, 75 Pa. St. 269; 2 Lead. Cas. Eq.* (*notes to Huguenin* v. *Baseley*) *1156.*

Bearing on both these questions is another consideration which ought not to be overlooked. It is clear enough that complainant intended to treat all her children alike, and thought she was doing so. She did not intend these deeds should take effect as to David unless they also took effect as to the other grantees. Now, there was clearly no present delivery of the deeds to Stephen and Mrs. Acker, and in case of her death, in the condition of affairs existing after the execution of the instruments, it is somewhat doubtful whether, under the circumstances proven, a subsequent delivery to those children of the deeds executed to them severally would serve to vest in them the title to the shares intended for them. Moreover, the existence of these deeds was known only to the defendant and his counsel, so that Stephen and Mrs. Acker were in a measure subject, as to their shares, to the disposition of the defendant to carry out in good faith his mother's directions as to the delivery of their deeds. Should he suppress or destroy them, they would at best have great difficulty in preventing him from sharing with them as heirs at law in the shares their mother intended for them, while he would, if his present position is maintained, enjoy his own share under deeds executed and duly delivered.

Coming now to the transactions of July 30th and August 1st, 1888, the act of the defendant in procuring the deeds and putting them on record is entirely unjustifiable and indefensible. All that can be said in palliation of it is, that the defendant was afraid his mother would encumber or convey the property upon which he had spent his money, and thus subject him to loss. But his proper remedy for such impending injustice was quite

·different from that which he adopted, and he can derive no benefit from it.    He says he acted under the advice of counsel in putting the deeds on record.    But it is due to the counsel to say that such advice was given on a decidedly partial statement of the facts.

As soon as complainant heard that the defendant had placed the deeds upon record she became excited over the idea that the property was now beyond her control and subject to the disposition of her son.    Her condition was such that for a day or two she was hardly responsible for her acts.    In that crisis she needed the advice of an experienced and independent counsel, and arranged, on July 31st, with her son-in-law to go with him to Jersey City the next morning for that purpose.    She was living with defendant, and entertained toward him mingled feelings of love and anger.    He, as I infer, ascertained her intentions to go to the city, and proposed to do something to satisfy her.    He says she proposed a deed for her life; but I am satisfied that she demanded an absolute reconveyance, and that he declined to make it, and proposed a deed for her life instead.    I think this is fairly inferable from the evidence of the defendant's wife, Mrs. Gertrude Martling, and that of Mrs. Force, with whom complainant and defendant boarded.    Complainant says, in substance, that she felt that she was in danger of losing all her property, and that a life right was better than nothing.    And, further, she swears that the defendant threatened her that unless she accepted the life right, he would put on record the deeds which she had executed to her older son, Stephen, and her daughter, Mrs. Acker, and the result would be she would have no property whatever. She swears to this, and I do not recollect that the defendant ·denied it.    He certainly did retain possession of the box, including the two deeds last mentioned.    And she swears that, influenced in part by these considerations and partly by the persuasions of the defendant, she broke her engagement to go to Jersey City with her son-in-law, and went with the defendant to Hackensack. There she submitted herself passively to whatever his counsel proposed, and accepted the deed for life, and at the same time ·executed a ratification, under seal, of the defendant's acts in putting his deeds on record.    All this was done without any advice

Martling *v.* Martling.

as to her right to have the deeds to her son set aside, or as to the efficiency of the remedy the law gave her in that behalf. The only conception she seems to have had on this subject was, that she might arrest her son upon a criminal complaint for abstracting her deeds; whereas, competent counsel must have told her that she could at once commence a suit in this court to set aside the deeds, and by means of a *lis pendens* effectually prevent the defendant from disposing of or encumbering her property, which conduct on his part she seemed particularly to fear. Under these circumstances, and considering the excited condition of complainant's mind, I think the execution of the deed of ratification and the acceptance of the deed for life do not bind the complainant, and must be set aside. This result was contested very faintly, if at all, as to the westerly lot, but was resisted as to the easterly lot on two grounds specially applicable to that lot, viz., *first*, that the conveyance of that lot was strictly in accordance with the long-cherished wish and intention of complainant; and, *second*, that defendant, with complainant's knowledge and assent, had made valuable improvements upon it. As to the first consideration, I do not think it sufficient to overcome the difficulties in the way of sustaining the conveyance; and the second point was promptly, and I think properly, met on the argument by an offer on the part of the complainant to pay to defendant such a sum of money as will measure the increase in value which his expenditures have given to the property.

I will advise a decree in accordance with these views. A reference will be necessary, unless the parties can agree upon the amount to be paid to the defendant.